# UNITED STATES DISTRICT COURT
for the
## SOUTHERN DISTRICT OF SOUTH DAKOTA

FILED

FEB 2 6 2008

CLERK

| | |
|---|---|
| MS. NANCY HEISINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 08 - 4027 |
| CJ VENTURES, LLC d/b/a CULVERS | ) |
| FROZEN CUSTARD RESTAURANT OF | ) |
| MITCHELL; and JASON BRADLEY and | ) |
| KRISTI BRADLEY, Owners; both in their | ) |
| Individual and Official Capacities | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, MS. NANCY HEISINGER, by and through her attorneys of record, South Dakota Advocacy Services, Inc., complaining of Defendants, CJ VENTURES, LLC d/b/a CULVERS FROZEN CUSTARD RESTAURANT OF MITCHELL ("Culvers" or "Defendant"); and JASON BRADLEY and KRISTI BRADLEY, Owners, both in their individual and official capacities, alleges:

### JURISDICTION AND VENUE

1. This action is brought pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, *et seq.*, and §12182, (the "ADA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended by Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981, ("Title VII"); and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621, *et seq.*, (the "ADEA").

2. Original jurisdiction is vested in this Court pursuant to 28 U.S.C. §§1331 and 1343(a)(4) in that this action involves federal civil rights statutes.

3.   The Court has supplemental jurisdiction to the South Dakota Human Relations Act of 1972 and South Dakota Codified Laws (SDCL) at Chapter 20-9, Chapter 20-13 and Chapter 21-3 pursuant to 28 U.S.C. §1367 in that the state claims are so related to the federal claims as to form part of the same case or controversy.

4.   Declaratory, injunctive and other appropriate relief is sought pursuant to 28 U.S.C. §§2201 and 2202, 42 U.S.C. §12117(a), 42 U.S.C. §1981a, 42 U.S.C. §2000e-5(g), and 29 U.S.C. §626(c), and SDCL Chapter 20-9 and Chapter 20-13 and Chapter 21-3.

5.   The events giving rise to this claim occurred in Mitchell, South Dakota.  Defendant Culvers is incorporated under the laws of the State of South Dakota since July 20, 2000. Defendant Culvers' principal place of business is in Mitchell, South Dakota.  All other defendants are owners or agents/employees of Defendant Culvers and at all relevant times were residents of South Dakota, Southern Division of the District of South Dakota.  Accordingly, venue is properly in this court, pursuant to 28 U.S.C. §1391(b).

## PARTIES

6.   Plaintiff Nancy Heisinger is a 50 year old female resident of Mitchell, South Dakota.

7.   Ms. Heisinger is formerly an employee of Defendant Culvers and of Defendant Owners Jason and Kristi Bradley.  42 U.S.C. §12111(4); 42 U.S.C. §2000e(f); 29 U.S.C. §630(f); SDCL §20-13-1(6).

8.   At all times relevant to this lawsuit, Ms. Heisinger has been and remains diagnosed with and treated for diabetes mellitus and bipolar disorder, and therefore has a "disability" within the meaning of the ADA, 42 U.S.C. §12102(2), and SDCL §20-13-1(4).

9.   At all times relevant to this lawsuit, Ms. Heisinger has been and remains a "qualified individual with a disability" within the meaning of 42 U.S.C. §12111(8).

2

10. At all time relevant to this lawsuit, Ms. Heisinger has been over the age of 40 and is protected person under the ADEA.  29 U.S.C. §631(a).

11. Defendant Culvers (CJ Ventures, LLC) is incorporated under the laws of the State of South Dakota as a restaurant and eatery located at 1015 Cabela Drive, Mitchell, South Dakota 57301, and has been "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person" and is a covered "employer" under the ADA, Title VII, ADEA, and the South Dakota Human Relations Act of 1972.  42 U.S.C. §12111(5), (7); 42 U.S.C. §2000e(b); 29 U.S.C. §630(b); SDCL §20-13-1(7), (11).

12. Defendant Culvers is a "covered entity employer" under the ADA, Title VII and under the South Dakota Human Relations Act of 1972.  42 U.S.C. §12111(5); 42 U.S.C. §2000e(b); 29 U.S.C. §630(b); SDCL §20-13-1(7).

13. At all times relevant to this lawsuit, Defendant Owners Jason and Kristi Bradley were and are residents of Mitchell, South Dakota, both of whom officially and individually meet the definition of "employer" as "*any person* within the State of South Dakota who hires or employs any employee, and *any person* wherever situated who hires or employs any employee whose services are to be partially or wholly performed in the State of South Dakota," under the ADA, Title VII, ADEA, and the South Dakota Human Relations Act of 1972.  42 U.S.C. §12111(5), (7); 42 U.S.C. §2000e(b); 29 U.S.C. §630(a), (b); SDCL §20-13-1(7), (11) (emphasis added).

## STATEMENT OF FACTS

14. At all times relevant to this lawsuit, Ms. Heisinger has been diagnosed and treated for diabetes mellitus and bipolar disorder.

15. Ms. Heisinger's diabetes mellitus requires daily maintenance with medications, monitoring of her blood sugars at least twice daily, careful intake of diabetic healthy foods, and regular physician visits, care and treatment.

16. . Ms. Heisinger will feel intoxicated, dizzy or lightheaded if her blood sugars get too high, and shaky or limp if her blood sugars get too low.

17. Ms. Heisinger's diabetes mellitus can substantially limit her major life activities including, but not limited to, eating, caring for herself, traveling or driving, engaging in leisure activities, following normal safety precautions, avoiding hazards, and working.

18. Ms. Heisinger's bipolar disorder has required regular and consistent follow up with her mental health physician and weekly reporting to a community mental health program including a case manager who, with Ms. Heisinger's active participation, designed an individualized treatment plan outlining the various services including case management, medication management, crisis intervention, housing assistance, and linkage to appropriate community services which will be provided to reach individualized treatment goals.

19. Ms. Heisinger has a long record of regular physician and mental health program care.

20. Ms. Heisinger's bipolar disorder can impact her major life activities including, but not limited to, interacting with others, engaging in activities of daily living, working, responding appropriately to criticism or suggestions, responding appropriately to supervisors or coworkers (e.g., seriously intimidated or overly sensitive), and living independently.

21. Ms. Heisinger has had a physical or mental impairment that substantially limits one or more of her major life activities.  42 U.S.C. §12102(2)(A).

22. Heath and Joann Dummer were the original General Managers hired by Defendant Owners Jason and Kristi Bradley at Culvers inception in approximately February 2001.

23. Heath and Joann Dummer had much experience in the restaurant business, and were thus primarily responsible for interviewing, hiring and supervising staff, scheduling, inventory, ordering, marketing, sales, promotions, employee relations, and the general running of the Culvers restaurant business and functions.

24. Ms. Heisinger initially disclosed her diabetes mellitus and bipolar disorder to Heath and Joann Dummer at the time of her interview and hire on or about March 22, 2001.

25. In approximately mid-2002, Ms. Heisinger specifically disclosed her bipolar disorder to Defendant Mr. Bradley.

26. Ms. Heisinger was initially assigned the 8:00 a.m. to 5:00 p.m. shift, which required employees to take meal breaks prior to the lunch rush beginning at 10:00 a.m.

27. That meant Ms. Heisinger would have to eat at 10:00 a.m., and not eat again until her shift ended at 5:00 p.m.

28. This nearly seven-hour delay in eating was unhealthy and unsafe for Ms. Heisinger due to her fluctuating diabetic blood sugars.

29. Since her hire in March 2002, Heath and Joann Dummer, and in their absence, Defendant Mr. Bradley, allowed Ms. Heisinger alternative meal break times in order to monitor her blood sugar levels and to eat.

30. Ms. Heisinger is and has been regarded as having diabetes mellitus and bipolar disorder. 42 U.S.C. §12102(2)(C).

31. In approximately November 2004, Defendant Owner Kristi Bradley ceased her employment at Wells Fargo Bank in Sioux Falls and began working on site at Culvers.

32. At that time, Defendant Mrs. Bradley began systematically taking over restaurant responsibilities theretofore carefully performed by Heath and Joann Dummer.

33. Defendant Mrs. Bradley specifically took over the scheduling of employees.

34. In November 2004, Defendant Mrs. Bradley began harassing Ms. Heisinger regarding her accommodation of alternative meal break times, stating they were not necessary.

35. At that time, Ms. Heisinger specifically disclosed her diabetes mellitus and bipolar disorder to Defendant Mrs. Bradley who said she already knew of Ms. Heisinger's disabilities.

36. Heath and Joann Dummer are expected to testify that between March 22, 2001 through approximately April 2005, Defendant Mr. Bradley regularly and consistently treated Ms. Heisinger different than other female employees because of her age (e.g., Defendant Mr. Bradley would faun over the younger teenage girls he hired, would inappropriately place his hands on the young girls and put his arms around them playing "slap and tickle", and otherwise behaved in a sexually provocative manner with the young girls in front of Ms. Heisinger and in the presence of other, older female employees, causing Ms. Heisinger to feel distressed and having her authority as Assistant Manager undermined).

37. Heath and Joann Dummer are expected to testify that Defendant Mr. Bradley habitually made demeaning and derogatory remarks regarding sex to Ms. Heisinger and other female employees while in Ms. Heisinger's presence (e.g., "What smells like tuna?" referencing female employees' feminine hygiene; "Which girls are still virgins and which ones are 'screamers'?"; when Ms. Heisinger wore makeup, would ask if she was trying to attract a man or find a husband; and telling Heath Dummer to "Stop hiring retards and old ladies.").

38. These regular and consistent sexually charged comments and conduct created a harassing, hostile and abusive work environment for Ms. Heisinger throughout the duration of her employment and created a continuing pattern of harassment and abuse.

39. Defendant Mr. Bradley was frequently overheard losing his temper, targeting and yelling at Rachel Eck, a female employee with a significant and visible disability.

40. Ms. Heisinger endured mental suffering and distress from the regular and consistent words and conduct that were targeted at other employees with disabilities in her presence.

41. Heath and Joann Dummer are expected to testify that Ms. Heisinger's known mental illness and medication prescriptions made her particularly susceptible to victimization and uniquely ill-equipped to defend herself or others against abuse and harassment.

42. Heath and Joann Dummer are expected to testify that between March 2001 through at least April 2005, Ms. Heisinger was a was competent, motivated, trustworthy hard worker who performed her duties and accepted criticism well, was promoted to Assistant Manager in September 2001, and never received a reprimand during the Dummers' four years with Culvers.

43. On or about April 1, 2005, General Managers Heath and Joann Dummer terminated their employment with Defendants Jason and Kristi Bradley for various reasons including Defendants' bad temper and their general mistreatment and abuse of their employees.

44. Heath and Joann Dummer are expected to testify that Defendant Owners Jason and Kristi Bradley specifically targeted Ms. Heisinger based on her disability, age and as a result of Defendant Mr. Bradley's habitual inappropriate sexual conduct with younger female employees.

45. Shortly after the Dummers left (early April 2005), Ms. Deb Morrison was hired as a Manager.  Ms. Morrison had previous extensive managerial experience at Pizza Hut, Pet Stores in Mitchell and Huron, and Curves in Mitchell, and as a self-employed feed business owner.

46. On or about April 1, 2005, Defendant Mrs. Bradley notified Ms. Heisinger that the accommodation of alternative meal break times was discontinued and Ms. Heisinger would have to begin taking her meal breaks at the times scheduled for all employees without disabilities.

7

47. Ms. Heisinger attempted to explain her continued need for the reasonable accommodation of alternative meal break times to monitor her diabetes and blood sugars.

48. Defendant Mrs. Bradley refused to allow alternative meal break times, and refused to discuss any other appropriate reasonable accommodations.

49. As a result of Ms. Heisinger not being allowed to eat on a modified meal break schedule, she began regularly experiencing low blood sugars later in her work shifts.

50. Ms. Heisinger would feel lightheaded, intoxicated, shaky, weak and / or fatigued.

51. As a result of low blood sugars, Ms. Heisinger experienced difficulty performing her work tasks, maintaining pace, and general fatigue until she could eat.

52. Ms. Morrison is expected to testify that Defendant Mrs. Bradley intentionally used her scheduling authority to systematically eliminate Ms. Heisinger's Assistant Manager duties and to publicly humiliate her by consistently scheduling her for menial "Dining" duties.

53. Assistant Manager duties generally include supervisory authority, working in the back, working with money and book keeping, taking customer concerns, assisting with the cash register, and handling of money, among other more highly skilled duties.

54. Employees scheduled to work "Dining" perform menial tasks which include wipe tables, pick up and throw away trash, sweep and mop the floors, handle dirty trays, haul garbage, keep condiments and drinking cups stocked, and periodically check and clean the bathrooms.

55. Being scheduled to work the "Dining" area is generally regarded the most menial and least desired assignment.

56. Defendant Mrs. Bradley consistently scheduled Ms. Heisinger for "Dining" with no other reason than to undermine Ms. Heisinger's authority and position as Assistant Manager.

57. Ms. Heisinger's coworkers and subordinate Crew Members saw the posted schedule, week after week, where Ms. Heisinger was repeatedly and consistently assigned to "Dining".

58. Defendant Owner Mrs. Bradley's consistent and repeated assignment of an Assistant Manager to "Dining" duties was a visible, public way to humiliate and disgrace Ms. Heisinger.

59. The result of this scheduling scheme was that Ms. Heisinger experienced knowing and intentional diminution of character and respect, intimidation, humiliation, and targeted hostility from Defendant Mrs. Bradley.

60. Ms. Morrison is expected to testify that between approximately April 2005 through approximately September 2005, Defendant Mr. Bradley regularly and consistently lost his temper, raised his voice and yelled at Ms. Heisinger, targeted her for miniscule mistakes commonly made by all employees, held Ms. Heisinger up to a standard of performance not expected of other Managers, and regularly and consistently treated Ms. Heisinger differently based upon her known mental illness and her known taking of medications.

61. Ms. Morrison is expected to testify that between approximately April 2005 through approximately September 2005, Defendant Mr. Bradley would specifically target Ms. Heisinger, stand in close proximity to her (hovering over her shoulder), and *in the presence of other employees* would loudly berate her and call her "stupid" or "retarded," would ask her if she was "doped up" or "drunk" (referencing her bipolar medications), and would lose his temper and curse and yell at Ms. Heisinger saying things like "You stupid woman – Get her out of the kitchen! She can't do anything right!" This threatening abuse resulted in Ms. Heisinger cringing with fear and intimidation which distracted her and actually caused her to make errors, which served to fuel Defendant Mr. Bradley's menacing presence and verbal assault.

62. Ms. Morrison is expected to testify that at various times between approximately April 2005 through approximately September 2005, Defendant Mrs. Bradley regularly made comments to Ms. Morrison that Ms. Heisinger was "so dumb" and she "can't have her do book work because she is too dumb." Ms. Heisinger regularly heard such comments being directed at her or overheard such comments being made between others about her.

63. Ms. Morrison is also expected to testify that other managers and employees would similarly target Ms. Heisinger, that Defendant Owners knew and where aware of such abuse and harassment against Ms. Heisinger, and refused to take any immediate action to stop the harassment. In fact, Defendant Owners contributed to such harassment and abuse and encouraged an environment where such abuse and harassment was perpetuated.

64. Ms. Morrison is approximately the same age as Ms. Heisinger and also experienced discomfort at the abuse that occurred against other employees with disabilities and against older female employees, but is expected to testify that Ms. Heisinger was distinctly treated much worse because she was known to have low self-esteem and could be verbally abused into submission by attacking her based on her known mental illness and medications.

65. Ms. Heisinger's actual ability and performance is more accurately reflected in the wholly positive employee performance review she was told she was given in December 2005.

66. Beginning in May 2005, Ms. Heisinger's mother's health rapidly declined.

67. Ms. Heisinger regularly and consistently informed Defendant Owners Jason and Kristi Bradley (and other co-workers and managers) of her mother's condition and whereabouts.

68. On September 10, 2005, Ms. Heisinger was working the 11:00 a.m. to 8:00 p.m. shift.

69. At approximately 5:00 p.m. during that shift, Ms. Heisinger received a telephone message from her sister-in-law, JoEllen Gates, stating that the family needed to come to the

hospital for final farewells as Ms. Heisinger's mother was in the imminent last stages of her life. Ms. Heisinger returned JoEllen's call at approximately 5:30 p.m. and arranged to attempt to leave work early and ride to Sioux Falls with JoEllen.

70. Ms. Heisinger communicated her mother's condition to Defendant Mrs. Bradley at approximately 6:00 p.m., and specifically requested permission to leave work early.

71. Defendant Mrs. Bradley refused her permission to leave early, stating it was too busy.

72. Ms. Heisinger was never given permission to leave work that day to see her mother.

73. Instead, Defendant Mrs. Bradley kept Ms. Heisinger until approximately 8:45 p.m.

74. At 8:45 p.m., Defendant Mrs. Bradley called Ms. Heisinger into the office and berated her for her depressed attitude, poor concentration and distracted performance that night.

75. Even knowing of Ms. Heisinger's mother's imminent and dire condition, Defendant Mrs. Bradley repeatedly asked Ms. Heisinger what her problem was.

76. Only when Ms. Heisinger repeated her overwhelming concern for her mother's condition did Defendant Mrs. Bradley acquiesce and allow Ms. Heisinger to leave.

77. Ms. Heisinger's mother died that night.

78. The extreme and outrageous trauma of being forced to remain at work in spite of her mother's dire and imminent state caused Ms. Heisinger extreme mental and physical pain and suffering, emotional anguish and distress, and greatly impaired her enjoyment of life.

79. Ms. Heisinger submits that it was due to her fear and intimidation from Defendant Mrs. Bradley's regular and consistent pattern of intentional hostile and abusive mental and emotional harassment that she was unable to leave the job site to see her mother.

80. During the Spring of 2006, Defendant Mrs. Bradley and Manager Stephanie Dirks repeatedly called Ms. Heisinger into the office under the pretext of discussing her performance.

11

81. Instead, they discussed and questioned Ms. Heisinger's medication regimen and alleged side effects and discussed how Ms. Heisinger was doing with her bipolar disorder.

82. Neither Defendant Mrs. Bradley nor Manager Dirks is a qualified mental health professional or physician of any sort.

83. These one-sided "discussions" resulted in Ms. Heisinger perceiving herself as being targeted because of her disability.

84. These one-sided "discussions" were merely pretext for continued harassment and verbal and emotional abuse.

85. During approximately the first week of June 2006, two Culvers employees, Peggy Alvarez and Donna Haas, approached Nancy stating that Defendant Mrs. Bradley and Manager Dirks had openly spoken to them regarding Ms. Heisinger's bipolar disorder diagnosis and the fact that she was prescribed medications to treat her bipolar, and publicly discussing their distaste for employees who were mentally ill or had to take medications, and discussed that Ms. Heisinger was going to be demoted.

86. Ms. Heisinger's discovery of Defendant Mrs. Bradley's public disclosure of her confidential medical condition and medication prescriptions was extremely disconcerting and further exacerbated Ms. Heisinger's experience of abuse and hostile mistreatment because of her known mental disabilities, and because she was taking medications for her bipolar disorder.

87. Further, discovery that it was an *Owner and a co-Manager* making improper disclosures worked to increase Ms. Heisinger's already self-conscious demeanor and particular susceptibility to intimidation and harassment since there were no superiors to whom she could report the abuse and seek recourse.  Nancy had no one to turn to for help.

88. On June 5, 2006, Defendant Mr. Bradley lost his brother in a car accident.

12

89. Shortly thereafter, Defendant Mr. Bradley confronted Ms. Heisinger stating the driver who struck and killed his brother had been taking anti-depressants and that was the reason his brother was dead.

90. Defendant Mr. Bradley created the distinct impression that he harbored extreme hostility toward persons taking such medications, specifically targeting and intimidating Ms. Heisinger because of her known mental illness and known medication prescription.

91. On June 19, 2006, Defendants Mrs. Bradley and Manager Dirks called Ms. Heisinger into the office to discuss a Warning Notice that cited Ms. Heisinger for performance issues.

92. The reasons stated for the demotion were embellished, misleading or completely concocted and were merely pretext for continued discriminatory conduct.

93. The Warning Notice cites Nancy for subjective performance issues like "lack of hussle [sic]" and "unwillingness" to work shifts that she was not scheduled to work. Such subjective allegations are easily concocted and are typical of pretext for discriminatory motives.

94. The Warning Notice alleges Ms. Heisinger was yelling at Crew Members and was getting complaints from her Crew Members when she closed the restaurant.

95. The Warning Notice alleges Ms. Heisinger failed to clear a minor employee from the floor. Ms. Heisinger was not in control of the physical presence of a worker who had punched out from work and was loitering *for two minutes* after the shift ended.

96. The Warning Notice was inaccurate, fabricated, and misleading regarding Ms. Heisinger's actual ability to perform the essential functions of her Assistant Manager position.

97. Mr. Mike Lachnit was a Culvers employee from approximately March 2005 through approximately March 2007, who worked as a cook, unloaded truck deliveries into stock inventory, and performed general maintenance. Mr. Lachnit is Ms. Heisinger's cousin.

13

98. Mr. Lachnit was present at Culvers full-time during Spring 2006 and thus had opportunity to witness Ms. Heisinger's actual job performance prior to the Warning Notice.

99. Mr. Lachnit is expected to testify that to his observation, Ms. Heisinger was, at all times prior to, during, and after her demotion, fully capable of performing all her physical and mental job duties as an Assistant Manager.

100. Mr. Lachnit is expected to testify that Defendant Mr. Bradley had a short temper and would yell at Nancy, even in the front area where other employees and customers could hear.

101. Mr. Lachnit is expected to testify that although everyone was careful not to say demeaning things about Ms. Heisinger in front of him since they are related, Mr. Lachnit regularly overheard Defendant Owners Jason and Kristi Bradley and other managers and employees disparaging Ms. Heisinger due to her mental illness and her known medications and whether or not she was "drunk" or "high," referencing her medication prescriptions.

102. Mr. Lachnit is expected to testify that such conversations took place in front of Defendant Owners' office, and that since Mr. Lachnit could overhear the slander occurring regarding Ms. Heisinger's disability and medications, Defendant Owners Jason and Kristi Bradley could also hear, and thus knew the harassment was occurring.

103. Heath and Joann Dummer and Ms. Deb Morrison are expected to testify that when Ms. Heisinger approached Defendant Owners Jason and Kristi Bradley requesting their support as Owners to encourage her Crew Members to perform their tasks, Jason would yell and both Kristi and Jason would berate Ms. Heisinger, calling her "stupid" and "retarded," ask her if she was "drunk," "drugged up," or "high," and used Ms. Heisinger's known medication prescriptions and mental illness as a basis to humiliate, undermine, harass and mock her.

14

104.     Effective June 26, 2006, as a result of the fabricated Warning Notice and pretextual performance allegations, Defendant Mrs. Bradley and Manager Dirks adversely demoted Ms. Heisinger to Crew Member, took her off the Assistant Manager schedule, eliminated her Assistant Manager duties, placed her on hourly pay from a salaried position, and reduced her hourly wage from $10.75 to $10.00, which constituted adverse employment actions.

105.     The Warning Notice was a pretext to hide Defendants' disability, sex and age related motives and to justify continued hostilities and harassment against Ms. Heisinger.

106.     Ms. Heisinger's demotion was outrageous and extremely hostile and harassing.

107.     At various times throughout Ms. Heisinger's employment, Defendant Owners Jason and Kristi Bradley (and other un-named Culvers employees) violated rules of confidentiality by disclosing information regarding Ms. Heisinger's medical condition, medications, symptoms, history, or other protected information with persons not entitled to receipt of that information.

108.     Following an accident where Ms. Heisinger broke three of her toes, she presented Defendant Mr. Bradley with two doctor notes requiring limited walking / carrying.  Ms. Heisinger chose to work the register (complete standing) rather than take leave without pay.

109.     However, substitute employees assigned to "Dining" neglected their duties such that Ms. Heisinger had to walk and clean tables, sweep and mop, and lift and carry large garbage bags in spite of her clear restrictions.

110.     Mr. Lachnit is expected to testify that he observed Ms. Heisinger having to perform walking and carrying duties while Defendant Mrs. Bradley and Manager Dirks stood idly by watching her limp with pain.

15

111.    Ms. Heisinger endured mental and emotional suffering due to Defendant Mrs. Bradley's and Manager Dirks' intentional and knowing indifference to her visible pain.

112.    Based upon harassing, hostile and abusive work environment perpetrated, encouraged and maintained by the Defendants, Ms. Heisinger was ultimately unable to continue suffering the humiliation, hopelessness and distress of that work environment on a continuous, daily basis, and on January 3, 2007, was forced to abandon her position of nearly six years.

113.    Mr. Lachnit, Heath and Joann Dummer, and Deb Morrison are expected to testify that Defendants knew of the harassing, hostile and abusive words and conduct perpetrated against Ms. Heisinger by other employees, but failed to take immediate, reasonable or appropriate steps to cease such conduct.

114.    Mr. Lachnit, Heath and Joann Dummer, and Deb Morrison are expected to testify that Ms. Heisinger was and remained physically and mentally able to perform all of her job duties as Assistant Manager, and that Defendants specifically targeted and treated Ms. Heisinger differently than other Managers and other employees on the basis of her disability, sex and age, and as a result of those intentional and malicious words and conduct, took adverse employment action against Ms. Heisinger to a degree that is extreme and outrageous to any reasonable member of civilized society.

115.    Following Ms. Heisinger's forced resignation, she was hired by Heath Dummer as at Ruby Tuesday restaurant in Mitchell from approximately January 2007 through approximately January 2008 (at which point Ms. Heisinger took a job at Arby's in order to obtain health insurance that she lost as a result of her constructive discharge from Culvers).

116.    Heath Dummer is expected to testify that Ms. Heisinger was fully capable and competent to perform work duties substantially similar to those she performed at Culvers.

16

117.   Ms. Heisinger's demotion and constructive discharge were not based upon any inability to perform her work functions or her failure to perform competently, but were a direct result of the outrageous and extreme continuing pattern of hostility, harassment and abuse she suffered because of her disabilities, age and sex.

## PROCEDURAL CONDITION PRECEDENT

118.   On March 21, 2007, Ms. Heisinger filed a charge of discrimination with the South Dakota Division of Human Rights ("Division") pursuant to SDCL §20-13-29 and SDCL §20-13-31 of the South Dakota Human Relations Act of 1972 and 20:03:02:01 and 20:03:02:03 of the Commission's Rules.  The charge was also filed with the Chicago District Office of the U.S. Equal Employment Opportunity Commission ("EEOC") and referred to the Division under 42 U.S.C. §12117(a) and pursuant to SDCL §20-13-8 of the South Dakota Human Relations Act of 1972 and 20:03:02:04 of the Commission's Rules.

119.   On September 7, 2007, the Division issued its "Determination of Probable Cause" finding "it is more likely than not that probable cause exists to believe Respondent is in violation of the South Dakota Human Relations Act of 1972, SDCL chapter 20-13 with respect to Charging Party's allegation of disability discrimination and constructive discharge."

120.   On September 14, 2007, Defendants notified the Division of their intent to refuse conciliation and that the Division should thereafter cease its jurisdiction over the matter according to SDCL §20-13-35 and SDCL §20-13-35.1.

121.   On November 1, 2007, the EEOC issued a substantial weight review recommendation that "the charge be issued as more likely than not, a violation occurred."  On November 13, 2007, the EEOC issued its final determination concluding "there is reasonable cause to believe that Charging Party was discriminated against in violation of the statute."  In

17

correspondence dated November 28, 2007, Ms. Heisinger received a Notice of Right to Sue (a copy of the notice is attached as Exhibit A).

## CLAIMS AND CAUSES OF ACTION

122.   Ms. Heisinger repeats the allegations of paragraphs 1-120 as though the same were set out at length herein.

123.   Ms. Heisinger is an individual with a disability as defined under the Americans with Disabilities Act, 42 U.S.C. §12102(2)(A), (B) and (C), and the South Dakota Human Relations Act of 1972, SDCL §20-13-1(4), in that Ms. Heisinger has been diagnosed by medically accepted clinical or laboratory diagnostic techniques with diabetes mellitus, a physical impairment, which is substantially limiting in one or more major life activities including, but not limited to, eating and working, and with bipolar disorder, a mental impairment, which is substantially limiting in one or more major life activities including, but not limited to, socializing, working, and living independently, and is regarded as having such impairments.

### I. First Cause of Action:

#### Failure to Accommodate / Failure to Initiate Interactive Process

124.   Defendants refused to accommodate Ms. Heisinger's need for alternative meal break times.  On or about April 2004, Defendant Mrs. Bradley harassed Ms. Heisinger and discontinued her previously allowed reasonable accommodation of taking alternative meal break times to monitor blood sugars and follow prescribed diabetes treatments in violation of the ADA and the South Dakota Human Relations Act.  42 U.S.C. §12111(9) and §12112(a), (b)(5); 29 C.F.R. §1630.2(o)(2); SDCL §20-13-10 and §20-13-23.7.

125.     Defendants not only failed to initiate an interactive process to determine an appropriate accommodation, but unilaterally discontinued the reasonable accommodation of alternative meal break times that had been proven successful and reasonable for nearly four years (March 2001 through on or about April 2005.)  Defendants refused to offer a stool or other seat or padded mat for Ms. Heisinger to utilize after she provided doctor restrictions due to broken bones in her foot, even though previous employees had received such accommodations, and refused to honor her standing / walking restrictions by idly waiting, necessitating Ms. Heisinger to assist with cleaning in the dining area and walking and carrying of food orders to pick-up customers waiting outside, and assigning her other cleaning duties.  29 C.F.R. §1630.2(o)(3).

126.     Defendants failed to use good faith efforts to reasonably accommodate Ms. Heisinger in violation of SDCL §20-13-23.7.

## II.  Second Cause of Action

### Intentional Infliction of Emotional Distress

127.     As described in this complaint, the Defendants' "continuing pattern of conduct" of abusive, hostile and harassing words and conduct based on Ms. Heisinger's disabilities, sex and age, including specific and particularly malicious instances of acts and words (e.g., Defendant Owner Kristi Bradley's harassment of Ms. Heisinger on the eve of her mother's death), was so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, were atrocious, and utterly intolerable in a civilized community, and constitute extreme and outrageous conduct;

128.     Defendants acted knowingly, intentionally or recklessly in their treatment of Ms. Heisinger;

19

129.    The Defendants' extreme and outrageous conduct caused Ms. Heisinger to suffer extreme emotional and physically disabling symptoms, particularly exacerbating Ms. Heisinger's known mental illness and physical symptoms;

130.    Ms. Heisinger has in fact suffered an extreme, disabling emotional response, including pain and suffering of both body and of mind, which greatly impaired her enjoyment of life as a direct result of the Defendants' intentional or reckless conduct.

131.    Defendant Owners had a duty to provide a work environment free of harassment or hostility, Defendant Owners had a heightened duty to ensure that their subordinate employees were protected from hostility and harassment from those in positions of authority, and Defendant Owners had a further heightened duty to protect persons with known mental disabilities and depression who are known to be particularly susceptible to victimization and abuse from hostile or harassing words or conduct (as discussed in *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496 at 592);

132.    Defendants failed in their duty, especially by perpetrating and encouraging the forbidden hostile and harassing words and conduct targeted against Ms. Heisinger (SDCL §20-9-1, §20-9-6);

## III.  Third Cause of Action

### Breach of Confidentiality

133.    Defendants breached their duty of confidentiality of protected information when they made derogatory statements referencing or implicating Ms. Heisinger's disabilities, medications, or alleged mental symptoms to each other and to other employees.  42 U.S.C. §12112(d)(4)(C).

## IV.  Fourth Cause of Action

<u>Harassment</u>

134.    Ms. Heisinger submits that Defendants' hostile and harassing conduct and words were particularly heinous in that Defendants were in positions of power and authority over Ms. Heisinger as Owners, and that based upon Ms. Heisinger's known mental health conditions for which she was known to take medications and seek regular mental health counseling, Ms. Heisinger was known to be particularly susceptible to victimization and was uniquely unable to protect or defend herself from the harassment and hostility targeted at her and those around her by Defendants in violation of the Americans with Disabilities Act, 42 U.S.C. §12112(a) (as interpreted by *Shaver v. Independent Stave Co.*, 350 F.3d 716 (8th Cir. 2003)); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a); Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a; the Age Discrimination in Employment Act, 29 U.S.C. §623(a); and SDCL §20-13-10, §20-13-23.7.

135.    Ms. Heisinger was subjected to hostile, harassing, demeaning, intimidating, prejudiced, debased, insulting, offensive and reprehensible words and conduct by Defendants;

136.    Such conduct and words were unwelcome in that Ms. Heisinger did not solicit or invite the conduct and regarded the conduct as undesirable or offensive;

137.    Such conduct was based on Ms. Heisinger's disability, sex and/or age;

138.    Defendants' extreme, outrageous, hostile, harassing and abusive words and conduct amounted to oppression and malice under SDCL §21-3-2.

<u>IV(a).  Harassment With Tangible Employment Action</u>

139.    Defendants demoted Ms. Heisinger and substantially changed her work assignments, job duties, title and pay rate, and through their actions and words constructively discharged her;

140.    Ms. Heisinger's age, sex and/or disability(s) was/were a "motivating factor(s)" in that Ms. Heisinger's age, sex and/or disability(s) played a part or a role in the Defendants' decisions to demote Ms. Heisinger and substantially change her work assignments, job duties, title and pay rate, and through their actions and words constructively discharge her;

141.    However, Ms. Heisinger's age, sex and/or disability(s) need not individually be the only reason for the Defendants' decision to demote Ms. Heisinger and substantially change her work assignments, job duties, title and pay rate, and through their actions and words constructively discharge her;

142.    The facts demonstrate that Defendants' stated reasons for demoting Ms. Heisinger and substantially changing her work assignments, job duties, title and pay rate, and through their actions and words constructively discharging her, were merely pretext to hide the discriminatory motives behind the harassing and hostile words and conduct.


IV(b).  Harassment With No Tangible Employment Action

143.    Such conduct was sufficiently severe or pervasive that a reasonable person in Ms. Heisinger's position would find such a work environment to be hostile, abusive, and harassing; and

144.    During the prolonged and continuous time such conduct and words were occurring and as a result of such conduct and words, Ms. Heisinger believed her work environment to be hostile and harassing.

IV(c).  Harassment By Non-Supervisor

145.    The Defendants knew or should have known of its other employees' hostile, harassing, demeaning, intimidating, prejudiced, sexually charged and debased, insulting, offensive and reprehensible words and conduct;

146.    The Defendants failed to take immediate and appropriate corrective action to end the harassment and hostile and abusive work environment.


## V.  Fifth Cause of Action

### Constructive Discharge

147.    Defendants made Ms. Heisinger's working conditions intolerable, and

148.    Ms. Heisinger's age, sex and/or disability(s) was/were a "motivating factor(s)" in that Ms. Heisinger's age, sex and/or disability(s) played a part or a role in the Defendants' decisions to demote Ms. Heisinger and substantially change her work assignments, job duties, title and pay rate, and through their actions and make her working conditions intolerable; and

149.    Defendants acted with the intent of forcing Ms. Heisinger to quit or, at least, Ms. Heisinger's resignation was a reasonably foreseeable result of the Defendants' actions and words in violation of the Americans with Disabilities Act, 42 U.S.C. §12112(a); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a); Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a; the Age Discrimination in Employment Act, 29 U.S.C. §623(a); and SDCL §20-13-10, §20-13-23.7.


## VI.  Sixth Cause of Action

### Vicarious Liability

23

150.    Defendant Culvers and Defendant Owners Jason and Kristy Bradley are vicariously liable for the creation of a hostile and harassing work environment created by their agents and employees, and for any direct, consequential, liquidated and punitive damages associated with any claims and / or causes of action, based upon their knowledge of the harassing, hostile and abusive words and conduct perpetrated by themselves and by their agent and employees, and for failing to take immediate, reasonable or appropriate action to cease such words and conduct in violation of Americans with Disabilities Act, 42 U.S.C. §12112(a), (b) and (c); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a); Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a; the Age Discrimination in Employment Act, 29 U.S.C. §623(a); and SDCL §20-13-10, §20-13-23.7.

## RELIEF REQUESTED

WHEREFORE, Ms. Heisinger prays for a judgment against Defendants and requests an entry of judgment providing:

(A)    A declaration that Defendants violated the rights and protections secured by the Americans with Disabilities Act, 42 U.S.C. §12112(a), (b) and (c); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a); Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a; the Age Discrimination in Employment Act, 29 U.S.C. §623(a); and SDCL §20-13-10, §20-13-23.7;

(B)    An award of any lost wages, back pay, loss of insurance coverage or COBRA payments, and any and all other direct losses due to Ms. Heisinger's constructive discharge;

(C)    An award of compensatory, punitive, liquidated, special and general damages in amounts to be determined upon trial secured by 28 U.S.C. §§2201 and 2202, 42 U.S.C.

§12117(a), 42 U.S.C. §1981a, 42 U.S.C. §2000e-5(g), 29 U.S.C. §626(c), and SDCL §20-13-35.1, §21-3-2.

(D)    An award to Ms. Heisinger of her reasonable attorney's fees; and

(E)    An award to Ms. Heisinger for her costs and such other relief as appears just and equitable.

Respectfully Submitted this 26th day of February, 2008.

SOUTH DAKOTA ADVOCACY SERVICES, INC.

Dominic M. Smith
2121 West 63rd Place, Suite 30
Sioux Falls, SD 57108
Phone: (605) 361-7438
Fax:    (605) 361-4338
Email:  smithd@sdadvocacy.com
Attorney for Plaintiff

25